# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# CIVIL NO. 3:10CV556-DSC

| | |
|---|---|
| WIRELESS COMMUNICATIONS, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | **MEMORANDUM AND ORDER** |
| v. ) | |
| ) | |
| EPICOR SOFTWARE CORPORATION, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**THIS MATTER** is before the Court on Defendant's "Motion to Dismiss" (document #8) and "Memorandum of Law in Support of Motion to Dismiss" (document #9), both filed November 30, 2010; and "Plaintiff's Response in Opposition to Defendant's Motion to Dismiss" (document #10) filed on December 17, 2010. On January 3, 2011, Defendant filed its "Reply Brief in Support of Motion to Dismiss" (document #13).

The parties have consented to Magistrate jurisdiction pursuant to 28 U.S.C. § 636(c), and the Motion is ripe for the Court's consideration.

Having carefully considered the arguments, the record, and the applicable authority, the Court will grant Defendant's Motion to Dismiss, as discussed below.

## I. PROCEDURAL AND FACTUAL BACKGROUND

Accepting the allegations of the Complaint as true, as we must at this early stage in the proceeding, Plaintiff Wireless Communications, Inc. ("Wireless") provides communications solutions and technical services primarily to government agencies, utility providers, hospitals, and other customers. (Compl. ¶ 4). Defendant Epicor Software Corporation ("Epicor") provides business and retail software solutions to customers around the world. (Compl. ¶ 5).

In the fall of 2008, Wireless sought to update its software system to integrate its sales, accounting, project-management, and other business operations. (Compl. ¶ 6). Based upon responses to its Vendor Software Questions and Requirements List, Wireless invited Epicor and other software vendors to bid on the job. (Compl. ¶¶ 7-8). Epicor accepted the invitation and presented two demonstrations of its products to Wireless. (Compl. ¶ 9). At both of these demonstrations, Epicor, through its agents, represented to Wireless that its proposed software solution would meet or exceed the requirements set forth in Wireless' Requirements List as well as perform the additional functions that Wireless desired in a software package. (Compl. ¶¶ 9-10).

Specific inquiry was made of Epicor regarding whether Wireless would be required to purchase additional software modules from third-party vendors. (Compl. ¶ 11). Epicor assured Wireless that its product would be a "one-stop solution" to Wireless' software needs. (Id.) Epicor's "one-stop solution" representation was important to Wireless as other software vendors represented that they would have to integrate software programs or modules of other software companies with their own in order to meet Wireless' software needs. (Id.) In addition to its assurances that its product met or exceeded Wireless' requirements without the need for third-party vendor software integration, Epicor also assured Wireless that its software was a fully tested commercial release and that Wireless would not be a Beta testing client. (Compl. ¶ 12).

Based on the demonstrations and Epicor's representations regarding its product, on January 21, 2009, Wireless and Epicor entered an End User License Agreement (the "Agreement"). (Compl. ¶ 13). Shortly thereafter, Epicor presented Wireless with its Consulting Statement of Work, which set forth the project scope and fees as well as the service terms and conditions in connection with the implementation of its software solution. (Compl. ¶ 15).

The project "kick-off" commenced in late April 2009. (Compl. ¶ 16). Problems arose with the software shortly after the kick-off, and Epicor representatives were unable to remedy them. (Compl. ¶ 17). Epicor hired an independent contractor to assist in rectifying the problems. (Compl. ¶ 18). Following a review of the software, the independent contractor hired by Epicor informed Wireless that the product sold to Wireless could not perform some of the most basic requirements contained in the Requirements List. (Id.)

In June 2009, Epicor notified Wireless that the project accounting software, which was originally demonstrated to Wireless as an integral part of the system and was one of the key factors in Wireless' decision to purchase Epicor's software, was not included in the software Wireless purchased. (Compl. ¶ 19). Epicor advised that Wireless would need to purchase a third party provider's software module through Epicor in order to satisfy one of Wireless' most basic project accounting needs, and an explicit basic requirement set forth in its Requirements List. (Compl. ¶¶ 19-20). Wireless purchased the additional software, because Epicor repeatedly represented to Wireless that with this additional software, the system would work as promised and demonstrated. (Compl. ¶ 20).

Repeatedly thereafter, the system still failed to perform in an integrated fashion and meet the requirements specified by Wireless. Each time, in reliance upon Epicor's promises that a new contract for additional software would resolve the problems, Wireless purchased additional software modules based on Epicor's assurances that the system would ultimately perform as promised and demonstrated. (Compl. ¶¶ 21 - 28).

Despite the additional expenditures by Wireless, the software system provided by Epicor still failed to meet Wireless' basic requirements and failed to perform in the manner demonstrated prior to entering into the Agreement. (Compl. ¶¶ 29-30). When Epicor represented that the system

was ready to "go live" it failed to perform many of the required functions or work in an integrated manner. The system also caused significant problems with Wireless' business operations and impaired Wireless' relationships with its customers and vendors. (Compl. ¶ 30). As a result, in addition to having to try to salvage its relationships with its customers and vendors, Wireless was forced to spend considerable sums in an effort to reconvert its system and data to its prior software. (Compl. ¶ 32).

On September 30, 2010, Wireless filed this Complaint in Mecklenburg County Superior Court. By Order dated October 1, 2010, the case was designated as a Mandatory Complex Business Case and assigned to the North Carolina Business Court before Judge Albert Diaz. On November 3, 2010, Epicor filed a Notice of Removal pursuant to 28 U.S.C. §§ 1332, 1441, and 1446 removing the action to this Court. Removal has not been challenged and appears to be proper.

Wireless' Complaint alleges claims for fraud/fraudulent inducement, negligent misrepresentation, unfair and deceptive trade practices, punitive damages, breach of contract, breach of express warranty, breach of the implied warranty of merchantability, breach of the implied warranty of fitness for a particular purpose, and unjust enrichment. On November 30, 2010, Epicor filed its Motion to Dismiss, seeking a dismissal of all of Wireless' claims except for the breach of contract and express warranty claims. This Motion has been fully briefed and is, therefore, ripe for disposition.

## II. DISCUSSION OF CLAIMS

### A. Standard of Review

In reviewing a Rule 12(b)(6) motion, "the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff." Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993). The plaintiff's "[f]actual allegations must be

4

enough to raise a right to relief above the speculative level." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." Id. at 563. A complaint attacked by a Rule 12(b)(6) motion to dismiss will survive if it contains "enough facts to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1960 (2009) (quoting Twombly, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 1949.

In Iqbal, the Supreme Court articulated a two-step process for determining whether a complaint meets this plausibility standard. First, the court identifies allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Id. at 1951. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 554-55) (allegation that government officials adopted challenged policy "because of" its adverse effects on protected group was conclusory and not assumed to be true). Although the pleading requirements stated in "Rule 8 [of the Federal Rules of Civil Procedure] mark[] a notable and generous departure from the hyper-technical, code-pleading regime of a prior era ... it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." Id. at 1950.

Second, to the extent there are well-pleaded factual allegations, the court should assume their truth and then determine whether they plausibly give rise to an entitlement to relief. Id. at 1951. "Determining whether a complaint contains sufficient facts to state a plausible claim for relief "will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 1950. "Where the well-pleaded facts do not permit the court to infer more

5

than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'-'that the pleader is entitled to relief,'" and therefore should be dismissed. Id. (quoting Fed. R. Civ. P. 8(a)(2)). In other words, if after taking the complaint's well-pleaded factual allegations as true, a lawful alternative explanation appears a "more likely" cause of the complained of behavior, the claim for relief is not plausible. Id. at 1951-52.

**B.     Wireless' Claims for Fraud, Negligent Misrepresentation, Unfair and Deceptive Trade Practices and Punitive Damages**

Wireless has asserted claims for fraud, negligent misrepresentation, unfair and deceptive trade practices, and punitive damages. Wireless alleges that Epicor fraudulently induced it into executing the Agreement, and that the tort claims are separate and distinct from its breach of contract and express warranty claims. However, these claims are fatally deficient because the complaint fails to sufficiently allege identifiable and distinct facts, arising outside of the primary breach of contract, to overcome the North Carolina economic loss doctrine.

The economic loss doctrine was first explained by the North Carolina Supreme Court in North Carolina Ports Authority v. Lloyd A. Fry Roofing, Co., 294 N.C. 73, 81 (1978) (rev'd on other grounds), where the Supreme Court outlined the general rule that "[o]rdinarily, a breach of contract does not give rise to a tort action by the promisee against the promisor." The Fourth Circuit further clarified North Carolina's application of the rule and carefully explained the underlying purpose of the doctrine in Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331 (4th Cir.1998). The Fourth Circuit explained that the dispute centered around the interpretation and performance of a thirty-five page contract and that "[t]he crux of this matter is and always has been a contract dispute." Id. at 346. The Court reasoned,

> The distinction between tort and contract possesses more than mere theoretical significance. Parties contract partly to minimize their future risks.

> Importing tort law principles of punishment into contract undermines their ability to do so. Punitive damages, because they depend heavily on an individual jury's perception of the degree of fault involved, are necessarily uncertain. Their availability would turn every potential contractual relationship into a riskier proposition.

Id. (quoting Strum v. Exxon Company, 15 F.3d 327, 330 (4th Cir. 1994)).

In the sales context, this Court has explained that "[t]he 'economic loss' rule prohibits the purchaser of a defective product from using tort law to recover economic losses." First Care Med. Clinic, Inc. v. Polymedco, Inc., No. 3:05-CV-82, 2006 WL 3497845, *4 (W.D.N.C. Dec. 4, 2006). Economic losses from defective products are all losses not involving physical injury or property damage. Coker v. DaimlerChrysler Corp., No. 01 CVS 1264, 2004 NCBC 1, 2004 WL 32676, *3 (N.C. Super. Jan. 5, 2006) (citing Reece v. Homette Corp., 110 N.C. App. 462, 466-67, 429 S.E.2d 768, 770 (1993)).

This Court has applied the economic loss rule in dismissing fraud, negligent misrepresentation, and unfair and deceptive trade practices claims on a Rule 12(b)(6) motion. Mecklenburg County v. Nortel Gov't Solutions, Inc., No. 3:07-CV-00320, 2008 WL 906319 (W.D.N.C. Apr. 1, 2008). In Mecklenburg County, this Court found that "[a]llowing the County to recover a purely economic loss in tort would eviscerate the North Carolina distinction between contract and tort law." Id. at *5. Similarly, the Middle District of North Carolina Court dismissed an unfair and deceptive trade practice claim against DaimlerChrysler where "the only damage alleged is damage to the product itself and the allegations of unfair and deceptive trade practices are intertwined with the breach of contract or warranty claims." Bussian v. DiamlerChrysler Corp., 411 F. Supp.2d 614, 627 (M.D.N.C. 2006).

In this case, the Court finds that Wireless failed to allege distinct and identifiable facts outside the realm of contract performance. Wireless' fraud, negligent misrepresentation, and unfair

and deceptive trade practices claims allege economic losses resulting from Epicor's purported misrepresentations about the Software, which Wireless purchased under a written contract and which failed to perform as Wireless expected. Wireless has not alleged any personal injury or harm to property other than the allegedly defective Software. Although at first glance Wireless makes a compelling argument that Epicor tortiously made representations to induce it to enter into the Agreement, make payments, and continue to buy additional software, these arguments fail because at the heart of Wireless' claim is the performance of the contract. "Epicor failed and has continued to fail to provide Plaintiff with a software package that functions in accordance with Epicor's representations, the Contract and Plaintiff's Requirements List." (Compl. ¶ 30). These alleged failures directly relate to Epicor's performance of the contract.

Although Wireless argues Epicor was negligent and fraudulent in its statements regarding the software and its ability to perform the promised functions, this does not change the fact that these statements were directly related to Epicor's performance of essential portions of the contract. "[N]egligent or intentional actions, relating to contract performance, do not transform contract claims into independent torts or trade practice claims; the negligent or intentional nature of the actions is irrelevant." Mecklenburg County at *5, (citing Broussard at 347(citing Branch Banking & Trust Co. v. Thompson, 107 N.C.App. 53 (1992)(holding that a mere breach of contract, even if intentional, does not give rise to independent non-contractual claims))).

Wireless argues that the economic loss rule does not apply in this case because its tort claims are based on Epicor's acts and omissions made prior to the initial Agreement, and prior to each of the subsequent contracts to purchase additional software modules. Wireless cites three Middle District of North Carolina cases for the proposition that fraud in the inducement claims, such as the claims asserted here, have been allowed in the same civil action as breach of contract claims where

8

the fraud occurred prior to and leading up to the execution of the contract. Schumacher Immobilien Und Beteiligungs Ag v. Prova, Inc., No. 1:09cv18, 2010 WL 3943754 at *2 (M.D.N.C. October 7, 2010); Schumacher Immobilien Und Beteiligungs Ag v. Prova, Inc., 2010 WL 2867603 at *26 (M.D.N.C. July 21, 2010); Ada Liss Group v. Sara Lee Corp., 2010 U.S. Dist. LEXIS 59691 (M.D.N.C. April 28, 2010).

The Court finds that those cases, which hold no precedential value, are distinguishable. The underlying claims in those cases challenged the validity of the contracts and the plaintiffs specifically pled facts that the defendants never intended to perform the contracts or specifically intended to deceive the plaintiffs. Here, Wireless never alleges that Epicor entered into the Agreement with the intent not to perform. To the contrary, the allegations in the Complaint suggest that Epicor fully intended to provide a working software system but ultimately failed.

The Court finds that Wireless fails to allege distinct, carefully circumscribed facts that could overcome the underlying policy of the economic loss doctrine, which supports dismissal. These sophisticated, commercial parties drafted a comprehensive contract to govern their relationship. Allowing Wireless to recover a purely economic loss in tort would be contrary to the North Carolina distinction between contract and tort law. Consequently, Wireless' claims of fraud, negligent misrepresentation, and unfair and deceptive trade practices are dismissed.

Under North Carolina law, a plaintiff cannot maintain an independent claim for punitive damages. Mitchell v. Lydall, Inc., 16 F.3d. 410, *4 (table decision) (4th Cir. 1994) (quoting Shugar v. Guill, 304 N.C. 332, 335, 283 S.E.2d 507, 509 (1981)) (affirming dismissal of punitive damages claim because the plaintiff failed to state a claim in tort and its statutory claim did not permit recovery of punitive damages). Therefore, since Wireless' tort and unfair and deceptive trade practices claims are dismissed, Wireless' punitive damage claim must also be dismissed.

**B. Wireless' Claims for Breach of Implied Warranty of Merchantability and Breach of Implied Warranty of Fitness for a Particular Purpose**

Wireless asserts claims for breach of implied warranty of merchantability and breach of implied warranty of fitness for a particular purpose. In support of these claims, Wireless alleges that the software purchased under the Agreement was defective and did not fit the purpose for which it was intended. (Compl. ¶¶ 80-82, 85-88). However, paragraph 5(c) of the Agreement states

> (c) EXCEPT FOR THE EXPRESS WARRANTY IN SECTION 5(a), THE SOFTWARE IS PROVIDED "AS IS", AND TO THE FULLEST EXTENT PERMITTED BY LAW, EPICOR AND ITS LICENSORS EXCLUDE ALL OTHER EXPRESS AND IMPLIED TERMS, WARRANTIES OR REPRESENTATIONS REGARDING THE SOFTWARE ARISING BY LAW OR OTHERWISE, INCLUDING WITHOUT LIMITATION ANY IMPLIED TERMS OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

(Document #9, Ex. A, § 5).[1]

In paragraph 11 of the Agreement, the parties agreed that all claims arising out of or relating to the Agreement would be governed by California law. (Document #9, Ex. A, § 11.) "In North Carolina, if the contracting parties have agreed to a choice-of-law provision, it will be enforced." Gregory Wood Prods., Inc v. Advanced Sawmill Mach. Equip., Inc., No. 5:06-CV-00087, 2007 WL 1825179, *2 (W.D.N.C. June 25, 2007); see also Bueltel v. Lumber Mut. Ins. Co., 134 N.C. App. 626, 631, 518 S.E.2d 205, 209 (1999). Because the implied-warranty claims arise out of the Agreement, paragraph 11 applies and California law governs Wireless' warranty claims.

The California UCC recognizes the implied warranties of merchantability and fitness for a particular purpose in the sale of goods but permits parties to disclaim those implied warranties in

---

[1] Plaintiff's Complaint asserted a claim for breach of the Agreement but failed to attach a copy of that contract. Epicor attached a copy of the Agreement to its Motion to Dismiss as Exhibit A. This Court may properly consider the Agreement in ruling on Epicor's Motion without converting it to a motion for summary judgment. *Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 176 (4th Cir. 2009); *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).

their sales agreements. Cal. Comm. Code §§ 2314, 2315, 2316(2) (West 2010). To effectively disclaim the implied warranty of merchantability, the parties' agreement must "mention merchantability and in the case of a writing must be conspicuous." Cal. Comm. Code § 2316(2). Similarly, to exclude or modify the implied warranty of fitness, the disclaimer must "be by a writing and conspicuous." Id. The California UCC specifically defines "conspicuous" to include the use of all capital letters or a contrasting type, among other things. Cal. Comm. Code § 1201(10).

Nowhere in the Complaint does Plaintiff allege that the disclaimer of all implied warranties, including the language in the Agreement specifically stating "ANY IMPLIED TERMS OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE," is invalid. (Document #9, Ex. A, § 5). Nor does Plaintiff allege that the prominently-displayed disclaimers in the Agreement are unenforceable.

The Court finds that the language in paragraph 5 of the Agreement satisfies all applicable requirements for valid warranty exclusions under the California Code. The exclusions were in writing and conspicuous, by being in contrasting-type and all capital letters, and mention merchantability. Consequently, Wireless' Complaint fails to state plausible claims for breaches of the implied warranties of merchantability and fitness for a particular purpose and therefore, are dismissed.

### C. Wireless' Claim for Unjust Enrichment

Unjust enrichment is an equitable claim where the court implies a quasi-contract in the absence of an actual agreement between the parties and permits a plaintiff to bring an action in restitution to recover the amount of the benefit conferred on the defendant. Booe v. Shadrick, 369 S.E.2d 554, 555-56 (N.C. 1988). If there is a contract between the parties, the contract governs the claim and the law will not imply a contract. Id. at 556; see also, Metric Constructors, Inc. v. Bank

of Tokyo-Mitsubishi, Ltd., 72 F. App'x 916, 920 (4th Cir. 2003) (quoting Booe v. Shadrick).

Here, Wireless admits that there is a contract between itself and Epicor in the Complaint (Compl.¶ 13). Given the existence of an actual contract, this Court will not recognize the existence of a quasi-contract. Therefore, Wireless' unjust enrichment claim is dismissed.

### III. ORDER

**NOW THEREFORE, IT IS ORDERED**:

1. Epicor's "Motion to Dismiss" (document #8) is **GRANTED,** and Counts I, II, III, IV, VII, VIII and IX of Wireless' Complaint (document #1, exhibit A) are **DISMISSED WITH PREJUDICE**.

2. The Clerk is directed to send copies of this Memorandum and Order to counsel for the parties

**SO ORDERED.**                Signed: January 10, 2011

David S. Cayer
United States Magistrate Judge